**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **TIFFANY McGEE INDIVIDUALLY** | * | |
| **AND O/B/O HER MINOR SON** | * | |
| **T.M.  AND** | * | **CASE NO.** |
| **NATHAN O'QUINN AND** | * | |
| **INEZ SIMMONS INDIVIDUALLY** | * | |
| **AND O/B/O THIER MINOR SON** | * | |
| **N.S.** | * | |
| | * | |
| **VS.** | * | |
| | * | |
| **JOSEPH P. LOPINTO, III IN HIS** | * | |
| **OFFICIAL CAPACITY AS SHERIFF** | * | |
| **OF JEFFERSON PARISH,** | * | |
| **DEPUTY SEAN PARKER,** | * | |
| **DEPUTY MICHAEL LEBLANC,** | * | |
| **DEPUTY MATHEW SMITHEY,** | * | |
| **DWAYNE J. MUNCH, SR. IN HIS** | * | |
| **OFFICIAL CAPACITY AS CHIEF OF** | * | |
| **WESTWEGO POLICE DEPARTMENT,** | * | |
| **WESTWEGO CITY** | * | |
| **OFFICER SAMUEL NORTON,** | * | |
| **OFFICER BLAKE NUZZO,** | * | |
| **OFFICER ANDREW CHAUVET,** | * | |
| **OFFICER RONELL LAPORTE,** | * | |
| **ABC INSURANCE COMPANY,** | * | |
| **XYZ INSURANCE COMPANY** | * | |

**********************************************************************

## <u>COMPLAINT WITH JURY DEMAND</u>

NOW INTO COURT, through undersigned counsel, come the Plaintiffs, Tiffany McGee, individually and on behalf of her minor son, T.M., and Nathan O'Quinn and Inez Simmons, individually and on behalf of their minor son, N.S., who all reside and are domiciled in Jefferson Parish, and respectfully represent the following:

1

**PARTIES**

1.

Made Defendants herein are the following:

a) SHERIFF JOSEPH LOPINTO, is and was at all relevant times the Sheriff of the Jefferson Parish Sheriff's Office ("JPSO"), a person of full age and majority domiciled in Jefferson Parish. He is sued in his official capacity;

b) DEPUTY SEAN PARKER, was at all relevant times to this complaint a deputy in the Jefferson Parish Sheriff's Office, is a person of full age and of majority, domiciled in Jefferson Parish. He is sued in his individual capacity;

c) DEPUTY MICHAEL LEBLANC, was at all relevant times to this complaint a deputy in the Jefferson Parish Sheriff's Office, is a person of full age and of majority, domiciled in Jefferson Parish. He is sued in his individual capacity;

d) DEPUTY MATHEW SMITHEY, was at all relevant times to this complaint a deputy in the Jefferson Parish Sheriff's Office, is a person of full age and of majority, domiciled in Jefferson Parish. He is sued in his individual capacity;

e) DWAYNE J. MUNCH, SR., is and was at all relevant times the Chief of the Westwego Police Department (WPD), a person of full age and majority domiciled in Jefferson Parish. He is sued in his official capacity;

f) WESTWEGO CITY, or in the alternative, THE CITY OF WESTWEGO (hereinafter "Westwego"), a local government entity and body politically created by statute, being a municipality, and political subdivision of the State of Louisiana, but not an agency, or department, or arm of the State of, and owns, operates, manages, directs, and controls the WESTWEGO POLICE DEPARTMENT (WPD), which employs Defendants Munch, Norton, Nuzzo, Chauvet, and Laporte;

g) OFFICER SAMUEL NORTON, was at all relevant times to this complaint an officer in the Westwego Police Department, is a person of full age and of majority, domiciled in Jefferson Parish. He is sued in his individual capacity;

h) OFFICER BLAKE NUZZO, was at all relevant times to this complaint an officer in the Westwego Police Department, is a person of full age and of majority, domiciled in Jefferson Parish. He is sued in his individual capacity;

2

i)  OFFICER ANDREW CHAUVET**,** was at all relevant times to this complaint an officer in the Westwego Police Department, is a person of full age and of majority, domiciled in Jefferson Parish. He is sued in his individual capacity;

j)  SERGEANT RONELL LAPORTE, was at all relevant times to this complaint a supervisory officer in the Westwego Police Department, is a person of full age and of majority, domiciled in Jefferson Parish. She is sued in her individual capacity;

k)  ABC INSURANCE COMPANY, an insurance company authorized to do, and doing business in the State of Louisiana providing general liability coverage for Sheriff Lopinto, JPSO, or any of its deputies, for any and all acts and damages occurring from this incident;

l)  XYZ INSURANCE COMPANY, an insurance company authorized to do, and doing business in the State of Louisiana providing general liability coverage for Chief Munch, Westwego City, WPD, or any of its officers, for any and all acts and damages occurring from this incident;

m) At all times relevant to this Complaint, all defendants acted under the color of state law.

n)  THIS PETITION PUTS ON NOTICE ANY EXCESS POLICY COVERING SHERIFF LOPINTO, CHIEF MUNCH, OR ANY OF THE NAMED DEPUTY/OFFICER DEFENDANTS.

### JURISDICTION AND VENUE

2.

The United States District Court has jurisdiction over the subject matter of this complaint under 42 U.S.C. 1983 and 28 U.S.C. 1331, 1343(a)(3), and 1367(a).

3.

The Eastern District of Louisiana is the appropriate venue to bring this complaint, because the facts that give rise to Plaintiffs' claims all took place within the Eastern District of Louisiana.

**FACTUAL ALLEGATIONS SURROUNDING MARCH 20, 2020**

4.

At all times relevant to this complaint, all defendants acted in concert and conspiracy and were jointly and severally responsible for the harms caused to plaintiffs. Defendants Parker, LeBlanc, Smithey, Norton, Nuzzo, Chauvet and Laporte were all law enforcement agents participating in the response to a call for back-up that resulted in Deputy Parker shooting T.M. and various law enforcement agents beating N.S.

5.

On the evening of March 20, 2020, 14-year-old T.M. was spending time with his fellow teenage friends N.S., and I.O. N.S. and I.O. are brothers. A friend, Jacolby Simmons, picked them up in a black Nissan Maxima. Jacolby Simmons had previously told them that the car belonged to his girlfriend's family.

6.

At all times, Jacolby Simmons was driving the vehicle. T.M. and N.O. were only ever passengers and never controlled the car.

7.

T.M. and N.S. had absolutely no knowledge that the vehicle they were riding in had been stolen several days prior.

8.

Neither T.M. nor N.S. had previous criminal records and neither had reason to believe the car was stolen. Neither T.M. nor N.S. were ever armed. Both children weighed under 140 pounds and were skinny and lanky.

9.

While driving through Westwego, Louisiana, Deputy Kyle Bonneval attempted to conduct a stop of the vehicle, but the driver, Jacolby Simmons, did not stop. T.M. and N.S. both repeatedly pleaded with Jacolby Simmons to stop the car, but he refused.

10.

A short chase ensued. The Westwego Police Department was called in to assist, as were additional JPSO deputies. Jacolby Simmons eventually abruptly stopped the vehicle after striking the tires on a storm drain.

11.

After stopping the car, Jacolby Simmons jumped out of the vehicle running. Just teenagers, T.M. and N.O. were scared and confused about what was happening. Neither had ever had such an encounter with law enforcement before. When Jacolby Simmons jumped out of the vehicle and took off running, T.M. and N.S. followed his example and did the same.

12.

T.M. and N.S.—unaware of why they were being stopped and chased, as well as bewildered about the unfolding events—jumped over a fence into the backyard of a home at the end of the block.

5

13.

On one of the officer's body camera footage, an officer can be heard yelling, "Stop or we will shoot your f**king ass!"

14.

A local resident alerted police to the presence of the young men in his backyard.

15.

When T.M. and N.S. saw police arrive to their location, they both stopped running and obeyed police orders to lay on the ground.

16.

As deputies approached 14-year-old T.M., he was defenseless, unarmed, on the ground, face-down, with his head facing the dirt. His body was only partially under the shed, but was in clear view of Deputy Parker at all times.

17.

Deputy Parker shouted out blatantly contradictory commands to T.M. There was an initial command for T.M. to stop moving, followed by a second command to show his hands.

18.

As 14-year-old T.M. attempted to comply with the contradictory order to show his hands, Deputy Parker without any justification or provocation shot T.M. in the back from just a few feet away. Deputy Michael LeBlanc watched from a short distance and did not intervene.

19.

T.M. never made any threatening or aggressive movements towards law enforcement. He only tried to comply with their contradictory commands.

20.

N.S. saw deputies shoot defenseless, unarmed T.M. N.S. then tried to surrender to law enforcement in fear of being shot and killed. He made no threatening or aggressive movements towards law enforcement.

21.

Deputy LeBlanc, Deputy Smithey, Officer Norton, and Officer Nuzzo saw N.S. surrender himself by extending his arms from under a shed. These law enforcement violently drug N.S.'s teenage, trembling body out from the shed.

22.

The deputies and officers proceeded to beat N.S. They kicked the defenseless young man in the face, causing extensive injuries.

23.

Law enforcement present and not actively beating N.S. took no actions to intervene and halt the savagery.

24.

Body camera footage also shows an officer placing his knee on the neck of one of the children as they handcuffed his arms behind his back. At one point, an officer can be heard yelling, "Show me your f**king hands, you piece of shit!"

25.

Despite his obvious, visually apparent injuries, N.S. was placed in a police cruiser.

26.

The driver, Jacolby Simmons, was not apprehended or arrested.

27.

No weapons of any kind were found on any of the young men.

28.

T.M., a defenseless 14-year-old shot in his back, was forced to sit on a curb with his arms handcuffed behind his back while bleeding from his back, shoulder, and arm.

29.

Video shows T.M. suffering and bleeding in shackles after being shot by a JPSO deputy while wearing a t-shirt actually supporting JPSO. This JPSO shirt was soaked in T.M.'s blood from his wounds.

30.

On body camera footage, T.M. can be heard moaning in pain while officers joked with him about his t-shirt and young age.

31.

At one point, an officer mentions that there was a "tussle over the gun." No such activity ever happened and this statement was part of the concerted and coordinated efforts of law enforcement to hide and conceal their overt misconduct and use of excessive force.

32.

T.M. remained in handcuffs until medical personnel arrived and asked the deputies to remove them. T.M. could not receive appropriate or adequate medical attention while shackled in the manner law enforcement chose to place him. Law enforcement displayed blatant and deliberate disregard and lack of concern for this 14-year-old child's health or safety prior to medical personnel arriving.

33.

In the minutes following this life-altering, traumatizing encounter, T.M. thought he may die or lose his arm at the tender age of fourteen.

34.

Additionally, N.S. was suffering extreme pain from the injuries law enforcement chose to inflict upon him during the beating and violent arrest.

35.

That evening, T.M.'s mother, Tiffany McGee, received a terrifying call that her child had been shot and was in the hospital. When she arrived, the doctors let her know that T.M. was alive, but the detective did not allow her to see her son, despite his young age.

36.

The detectives never mentioned to Ms. McGee that T.M. was shot by a deputy, and Ms. McGee was forced to leave her son there alone at night without any answers as to what happened.

37.

When Ms. McGee left the hospital, she immediately called Mr. O'Quinn, the father of N.S. and O.I. When his sons did not answer their phones, Mr. O'Quinn began frantically calling the jail and juvenile facilities, but was offered no answers.

38.

Left to investigate what happened to their children on their own, the plaintiff parents were able to track T.M.'s cellphone using a locater app. The app placed the phone at the Westwego Police Department.

39.

After the parents questioned deputies at the department, an officer finally told Ms. McGee that her son had been shot by a JPSO deputy.

40.

Though T.M. was suffering—and not even close to healed—from the gunshot wounds deliberately and unjustifiably inflicted on him by the JPSO deputy, he was discharged late that evening into JPSO custody. The following day, Ms. McGee picked up T.M. up at the juvenile lockup. He was still wearing hospital clothes and his arm was in a sling.

41.

N.S. was eventually taken to the hospital where he required CT scans and X-rays due to the severity of the injuries sustained to his face and arm.

42.

T.M. and N.S.'s arrest reports from that evening state that they were apprehended after fleeing a stolen car, but make no mention of an officer-involved shooting or the injuries either of the boys sustained.

43.

In the weeks that followed, the plaintiff parents fought diligently for answers as to what happened their sons, and accountability for the deputies involved. Ms. McGee called Internal Affairs, the FBI and the sheriff's office, documenting each name, number, and attempt made.

44.

Two months after the incident on May 27, 2020, Ms. McGee returned to the JPSO's office. In a recorded conversation, she was informed by the head of the shooting squad that the department had not had any officer-involved shootings in March. The head of the shooting squad insisted it must have just been a taser.

45.

Whether through incompetence or deliberate perniciousness, this statement was patently untrue. T.M. had a bullet wound in his shoulder. There is a crime lab report and a discharge of weapons report—both related to Deputy Parker's service weapon—dated March 20, 2020.

46.

From March 20, 2020 until June 3, 2020, Ms. McGee had repeatedly pleaded with JPSO to investigate what was done to T.M. and N.S., but they refused. Not only did this law enforcement agency refuse to investigate, they also denied the incident ever even happened.

47.

Only after Ms. McGee's persistence did a detective call and ask her to bring in her son, T.M., to give a statement. On June 3, 2020, T.M. gave a statement to Detective Fallon.

48.

In T.M.'s statement, he gave an honest, full account of what happened on the evening of March 20, 2020, and assisted officers by identifying the driver of the vehicle, Jacolby Simmons, both by name and photograph.

49.

In the months following the incident, Sheriff Lopinto did not disclose to the public or the press that his deputies had shot a child. The facts did not come to light until three months later when an off-duty officer from another agency shot another teenager in the head in Metairie.

50.

On June 23, 2020, the families' lawyers gave a press conference exposing the egregious acts committed against T.M. and N.S. by JPSO and WPD. Once again, T.M. and N.S.'s families were forced to take action because JPSO and Sheriff Lopinto had continually refused to do so.

51.

Sheriff Lopinto—after his office had denied for months that these events ever even happened—then gave a press conference just two hours later on the same day claiming that T.M. was hiding behind his lawyers and refusing to talk to JPSO. This was after Ms. McGee went to JPSO multiple times—all of the times are recorded—and T.M. gave a full statement to JPSO

without counsel present. Like his deputies earlier, either Sheriff Lopinto was lying or had no knowledge of what was actually occurring in his department.

52.

A supplemental report documenting the discharge of the deputy's weapon and offering the officers' full account of the incident was not completed until June 30, 2020, more than three months after the incident, but just a week after the family's press conference.

53.

According to this supplemental report, despite their very close proximity to Deputy Parker when he fired his weapon and in support of their conspiracy to hide their use of excessive force, Officers Norton and Nuzzo claim to have not heard a gunshot. However, two homeowners near where the incident took place were able to hear the gunshot—one from the edge of his driveway, and the other from inside his home.

54.

Fragments of the bullet are still lodged in T.M.'s body, and he still experiences excruciating pain as a result. Both boys live in a state of constant fear of the police.

55.

At all times relevant to this Complaint, the conduct of Defendants Parker, LeBlanc, Smithey, Norton, Nuzzo, Chauvet and Laporte were in willful, reckless, and callous disregard of T.M. and N.S.'s rights under federal and state law.

56.

As a direct result and proximate result of the conduct of all Defendants, the Plaintiffs suffered and continue to suffer extraordinary damages, including the painful bullet wounds to T.M., the beating of N.S., emotional distress, and trauma, loss of the enjoyment of life, psychological harm, and pain and suffering, some of which may be permanent.

**FACTUAL ALLEGATIONS SURROUNDING EMPLOYMENT, TRAINING, SUPERVISION, AND DISCIPLINE OF JPSO OFFICERS**

57.

The Sheriff of Jefferson Parish at all relevant times before, during, and after this incident was Joseph Lopinto, making him the responsible decisionmaker and policymaker for the JPSO.

58.

In Sheriff Lopinto's official capacity, he was and is responsible for adopting, implementing, promulgating, and enforcing policies, customs, and practices pertaining to making arrests and preserving peace in Jefferson Parish.

59.

Additionally, Sheriff Lopinto is responsible for the screening, hiring, disciplining, training, supervising, and the retraining of JPSO deputies to ensure each officer was and is qualified and properly trained to perform the duties and functions of a peace officer including making arrests, preserving the peace, and the constitutional use of force. Sheriff Lopinto has a responsibility in supervising and enforcing and implementing these training, discipline, and enforcement of these policies, customs, practices.

60.

Based on the extreme misconduct of Defendants Parker, LeBlanc, and Smithey, and upon information and belief, Defendant Lopinto did not properly examine and scrutinize the background of the Defendants Parker, LeBlanc, and Smithey.

61.

Based on the extreme misconduct of Defendants Parker, LeBlanc, and Smithey, and upon information and belief, Defendant Lopinto did not properly train, supervise, and/or discipline Defendants Parker, LeBlanc, and Smithey with regard to proper police practices.

62.

Upon information and belief, in willful, reckless, and callous disregard to T.M. and N.S.'s lives and rights under federal and state law, Defendant Lopinto did not have an adequately trained upon, promulgated, and enforced use of force policy in place for the JPSO at all relevant times upon which officers were sufficiently or adequately trained so as to know what extent of force is appropriate in situations.

63.

Despite Jefferson Parish being a majority white parish, there is an overt policy and practice whereby people of color are disproportionately stopped, detained, harassed, subjected to use of force, and shooting by JPSO deputies. Lopinto has endorsed this policy by failing to correct it or taking any disciplinary or corrective actions. Instead, Sheriff Lopinto alleges that victims of the JPSO's abuse hide behind lawyers weeks after they give full statements to Sheriff Lopinto's very own subordinates.

15

64.

Numerous state and federal lawsuits against Sheriff Lopinto and his deputies demonstrate a pattern, custom, and practice of excessive use of force, especially against people of color. These suits include, but are not limited to, the following:

A. In 2020, the Sheriff and his deputies were sued:
   a. After two deputies sat on a handcuffed autistic child for nine minutes and six seconds, suffocating and killing him. His parents were there and had to witness the violent death of their child at the hands of police. There had been at least three previous federal lawsuits against the Sheriff and his deputies alerting them to the dangers of death by positional asphyxiation and training on the same, demonstrating the Sheriff's prior knowledge but failure to properly retrain, supervise, and discipline his deputies;
   b. After plain clothes officers in unmarked vehicles surrounded unarmed men in a parking lot and fired over 20 rounds into their car, killing one and severely wounding the other. It is further alleged that deputies withheld medical care from both men, and the passenger, who was critically wounded, was forced to remain in the car for 1-2 hours after the shooting occurred. The deputies fired with such careless and reckless disregard that one of their bullets struck a fellow deputy;
   c. For striking a man in the face with a service weapon while he knelt on the pavement with his arms handcuffed behind his back, and then repeatedly kicking him in the head;
   d. For excessive force and violation of First Amendment rights after brutally arresting a college-aged pedestrian who was quietly documenting police violence on his cell phone. One of the deputies involved had previously been terminated from at least one other law enforcement position because of instances of misconduct, and another had been a defendant in a prior civil rights case involving excessive force and wrongful arrest;
   e. After an officer working in the prison repeatedly verbally and sexually assaulted an inmate, forced him to perform oral sex on him, and threatened retaliation if his actions were reported.
B. In 2019, the Sheriff and his deputies were sued:
   a. After shoving a woman who was eight-months pregnant stomach-first into a desk, and then slapping and punching her in the face as her 2-year-old child watched. The force of the push was so violent that it caused the vulnerable woman to expel vaginal fluid. Despite the fact that this fluid could have been a sign of detriment to her unborn child, the officers attempted to book her into jail rather than bringing her to the hospital;

16

    b.  After fatally choking a man in their custody in a case eerily similar to that of George Floyd. This was the second time in mere months that one of the deputies involved was accused in a federal lawsuit of using excessive force;

    c.  For verbally and physically accosting female children in a mall parking lot as they attempted to leave. When the mother of one of the children asked why her 11-year-old was being arrested, she, too was forcibly thrown against the wall and arrested. The degree of force with which she was handled caused her pants to fall down in front of hundreds of onlookers.

C.  In 2018, the Sheriff and his deputies were sued:

    a.  For firing AR-15s and handguns into a vehicle moving out of a parking space, striking the driver and causing the vehicle to continue forward, eventually landing in a drainage canal. The plaintiff was in a coma for one week and in the hospital for four weeks. He has undergone numerous surgeries and now lives with bullet fragments in his face;

    b.  For violently beating a man as he lay face-down on the ground with his arms handcuffed behind his back. The plaintiff lost consciousness during the encounter due to severe blows to his head. The blood pouring from his head wound was so voluminous that it puddled on the ground, soaked his clothes, and splattered onto a nearby vehicle;

    c.  For the use of deadly force against a man when, without identifying themselves as police or any prior warning, they shot him in the back as he fled on foot. The victim suffered temporary paralysis, was restricted to a wheelchair for a long period of time, and is permanently disabled;

    d.  For ramming a man with their police vehicle and then viciously beating, kicking, and stomping him as he lay on the ground already suffering catastrophic injury. In this suit, the plaintiff listed five other previous federal complaints against the deputies involved, but no disciplinary action or termination had resulted against them, despite the Sheriff's knowledge of their misconduct;

    e.  For confiscating plaintiff's monetary property during a traffic stop and refusing to return the entire amount. When the plaintiff objected, a deputy choked and struck him repeatedly. They then arrested him and inexplicably brought him to his daughter's school so that she could see him in handcuffs;

    f.  After deputies—including Defendant Deputy Parker— handled a citizen so aggressively that he suffered broken bones and torn ligaments in his ankle and hand;

D.  In 2017, the Sheriff and his deputies were sued for the excessive force and detention of a 74-year-old tourist and doctor from Switzerland. The elderly man's head was forcefully pushed against the wall during his arrest. He was then caged and required to stand with his arms handcuffed behind his back for hours, despite his age. He was later brought to jail where deputies refused him the right to call his embassy or consulate for assistance.

E.  This disturbing and upsetting list of lawsuits is sadly not exhaustive. There are numerous other lawsuits against Sheriff Lopinto and his deputies not listed herein.

65.

Alarmingly, at least 12 men and boys have died during an arrest or pursuit by the Jefferson Parish Sheriff's Office since 2015, according to an NBC News review of news articles and documents. All were Black or Latino. Three were under the age of 18.

66.

The above lawsuits show the incident with T.M. and N.S. is not an outlier, but rather part of a continuing pattern, custom, and practice of JPSO under the direction and supervision of Sheriff Lopinto. Rather than address these issues, Sheriff Lopinto continues to deny and ignore them.

67.

Despite JPSO being one of the state's largest and best resourced offices with its own crime lab, helicopter and a raft of military-grade equipment, including BearCat armored tanks, Sheriff Lopinto refuses to implement the use of body-worn cameras as a mechanism of transparency to the public and accountability for the actions of his deputies. In fact, Sheriff Lopinto's office is the largest state law enforcement agency not to utilize body-worn cameras. Indeed, in response to an approximately 200-person protest in 2020 to the JPSO's killing of Modesto Reyes, JPSO deployed actual tanks. Sheriff Lopinto is on camera stating he has chosen not to wear body-cameras.

68.

Further, although many police departments and sheriff's offices across the state have memorandums of understanding with Louisiana State Police to investigate officer-involved

shootings, Sheriff Lopinto does not. He instead only allows himself to review officer-involved-shootings.

69.

Upon information and belief, Sheriff Lopinto has not changed his hiring, training, or supervision policies and their enforcement despite the numerous use of force complaints and lawsuits, including those listed in paragraph 64.

70.

Further, Sheriff Lopinto has a history of not properly disciplining or firing officers when they engage in illegal or improper conduct, including excessive use of force and improper deadly use of force.

71.

Defendants Parker, LeBlanc, and Smithey's extreme misconduct was a product of this environment and undertaken pursuant to de facto policies, practices, and/or customs—both written and unwritten—of the JPSO.  Sheriff Lopinto is guilty of the following wrongful acts, including but not limited to:

1. Failing to properly hire, supervise, and train JPSO deputies;
2. Failure to promulgate, train, and enforce an adequate and constitutional use of force policy;
3. Failure to promulgate, train, and enforce an adequate and constitutional lethal use of force policy;
4. Failure to promulgate, train, and enforce an adequate and constitutional de-escalation tactics;
5. Failure to promulgate, train, and enforce an adequate and constitutional non-discriminatory law enforcement practices to protect African-American citizens of Jefferson Parish;

6. Failing to reprimand and discipline JPSO deputies who engage in misconduct;
7. Failing to retrain and/or otherwise control JPSO deputies who engage in excessive force and/or unjustified shooting against civilians;
8. Failing to follow appropriate policies and procedures to address and correct repeated use of excessive force;
9. Failing and inadequately investigating complaints and allegations of excessive force and other misconduct by JPSO deputies;
10. Failing to retrain and otherwise control JPSO deputies who engage in excessive force and unjustified use of deadly force;
11. Tacitly approving of JPSO deputies using their power and position to interfere with other citizens' rights;
12. As a matter of both policy and practice Sheriff Lopinto facilitating this type of misconduct by failing to protect civilians from reckless indifference of Defendant's agents, servants, and employees in his sheriff's department; and
13. Failure to train, supervise, and discipline JPSO deputies regarding providing honest and accurate accounts of officer involved shootings to investigating authorities.

72.

As a direct result and proximate result of the conduct of Defendants Lopinto, Parker, LeBlanc, and Smithey, Plaintiffs have suffered and continue to suffer extraordinary damages, including the prolonged loss of liberty, emotional distress, and trauma, loss of the enjoyment of life, psychological harm, and pain and suffering, some of which may be permanent, as well as financial losses.

**FACTUAL ALLEGATIONS SURROUNDING EMPLOYMENT, TRAINING, SUPERVISION, AND DISCIPLINE OF WESTWEGO POLICE OFFICERS**

73.

The City of Westwego, or in the alternative, Westwego City (hereinafter "Westwego"), controls and employs its own police department known as the Westwego Police Department (WPD). The Chief of Police of Westwego Police Department (WPD) at all relevant times before,

during, and after this incident was Dwayne J. Munch, Sr., making him the responsible decisionmaker and policymaker for the WPD.

74.

In Chief Munch's official capacity, he was and is responsible for adopting, implementing, promulgating, and enforcing policies, customs, and practices pertaining to making arrests and preserving peace in Westwego.

75.

Additionally, Chief Munch is responsible for the screening, hiring, disciplining, training, supervising, and the retraining of WPD officers to ensure each officer was and is qualified and properly trained to perform the duties and functions of a peace officer including making arrests, preserving the peace, and the constitutional use of force. Chief Munch has a responsibility in supervising and enforcing and implementing these training, discipline, and enforcement of these policies, customs, practices.

76.

Based on the extreme misconduct of Defendants Norton, Nuzzo, Chauvet and Laporte, and upon information and belief, Defendant Munch did not examine and scrutinize the background of the Defendants Norton, Nuzzo, Chauvet and Laporte.

77.

Based on the extreme misconduct of Defendants Norton, Nuzzo, Chauvet and Laporte and upon information and belief, Defendant Munch did not properly train, supervise, and/or discipline Defendants Norton, Nuzzo, Chauvet and Laporte with regard to proper police practices.

21

78.

Upon information and belief, in willful, reckless, and callous disregard to T.M. and N.S.'s lives and rights under federal and state law, Defendant Munch did not have an adequately trained upon, promulgated, and enforced use of force policy in place for the WPD at all relevant times upon which officers were sufficiently or adequately trained so as to know what extent of force is appropriate in situations.

79.

Several state and federal lawsuits against the Westwego, Chief Munch, and his officers demonstrate a pattern, custom, and practice of excessive use of force, especially against people of color. These suits include, but are not limited to, the following:

a. For officers falsely arresting and imprisoning a Latino woman, without any investigation, on charges that her passport was fraudulent;

b. For officers tasing and beating a man, slamming his head into the concrete and causing him a concussion. When paramedics arrived, an officer on scene refused him access to medical care;

c. Against Chief Munch by a subordinate officer asserting race-based employment discrimination;

d. Against Chief Munch for intimidating and threatening harm against the plaintiff;

e. Other lawsuits and complaints not listed herein.

80.

The above lawsuits show the incident with T.M. and N.S. is not an outlier, but rather part of a continuing pattern, custom, and practice of WPD under the direction and supervision of Chief Munch.

81.

Upon information and belief, Westwego and Chief Munch have not changed their hiring, training, or supervision policies and their enforcement despite the numerous use of force complaints and lawsuits, including those listed in paragraph 79.

82.

Further, Westwego and Chief Munch have a history of not properly disciplining or firing officers when they engage in illegal or improper conduct, including excessive use of force and improper deadly use of force.

83.

Defendants Norton, Nuzzo, Chauvet and Laporte's extreme misconduct was a product of this environment and undertaken pursuant to de facto policies, practices, and/or customs—both written and unwritten—of the WPD. Westwego and Chief Munch are guilty of the following wrongful acts, including but not limited to:

1. Failing to properly hire, supervise, and train WPD officers;
2. Failure to promulgate, train, and enforce an adequate and constitutional use of force policy;
3. Failure to promulgate, train, and enforce an adequate and constitutional lethal use of force policy;
4. Failure to promulgate, train, and enforce an adequate and constitutional de-escalation tactics;

5. Failure to promulgate, train, and enforce an adequate and constitutional non-discriminatory law enforcement practices to protect citizens of color in Westwego;

6. Failing to reprimand and discipline WPD officers who engage in misconduct;

7. Failing to retrain and/or otherwise control WPD officers who engage in excessive force and/or unjustified shooting against civilians;

8. Failing to follow appropriate policies and procedures to address and correct repeated use of excessive force;

9. Failing and inadequately investigating complaints and allegations of excessive force and other misconduct by WPD officers;

10. Failing to retrain and otherwise control WPD officers who engage in excessive force and unjustified use of deadly force;

11. Tacitly approving of WPD officers using their power and position to interfere with other citizens' rights;

12. As a matter of both policy and practice Chief Munch facilitating this type of misconduct by failing to protect civilians from reckless indifference of Defendant's agents, servants, and employees in his police department; and

13. Failure to train, supervise, and discipline WPD officers regarding providing honest and accurate accounts of officer involved shootings to investigating authorities.

84.

As a direct result and proximate result of the conduct of Defendants Munch, Norton, Nuzzo, Chauvet and Laporte, Plaintiffs have suffered and continue to suffer extraordinary damages, including the prolonged loss of liberty, emotional distress, and trauma, loss of the enjoyment of life, psychological harm, and pain and suffering, some of which may be permanent, as well as financial losses.

**CAUSES OF ACTION**

**Count I**
**Federal Constitutional Claims**

**Plaintiff v. Defendants Westwego,**
**Lopinto and Munch in Their Official Capacities, and**
**Parker, LeBlanc, Smithey, Norton, Nuzzo, Chauvet, Laporte in Their Individual Capacities**

85.

The actions or in actions of Westwego, Sheriff Lopinto, Deputies Parker, LeBlanc, Smithey, Chief Munch, and Officers Norton, Nuzzo, Chauvet, Laporte violated T.M. and N.S's rights under the Fourth and Fourteenth Amendments to be free from the unlawful use of force.

**Count II**
**Federal Constitutional Claims**

**Plaintiff v. Defendants Westwego**
**Lopinto and Munch In Their Official Capacities**

86.

The actions or inactions of Defendants Lopinto, Westwego, and Munch violated T.M. and N. S.'s Fourth and Fourteenth Amendments Rights to the U.S. Constitution, directly or proximately causing their injury and suffering due to Defendants Lopinto and Munch's failure to train, supervise, and discipline Parker, LeBlanc, Smithey, Norton, Nuzzo, Chauvet, and Laporte.

87.

The actions or inactions of Defendants Lopinto, Westwego, and Munch violated T.M. and N. S.'s Fourth and Fourteenth Amendments Rights to the U.S. Constitution, directly or

proximately causing their injury and suffering by creations of or failure to correct unconstitutional policies, practices, patterns, and/or customs.

88.

Sheriff Lopinto permitted, encouraged, tolerated, and knowingly acquiesced in an official pattern, practice or custom of JPSO Deputies, including JPSO Defendant Deputies, of violating the constitutional rights of the public at large, including T.M., N.S., and the parent Plaintiffs.

89.

Sheriff Lopinto had been put on notice of the need for policy and training in the use of excessive force and race-based policing due to the numerous past injuries and deaths of persons in JPSO custody.

90.

Westwego and Chief Munch permitted, encouraged, tolerated, and knowingly acquiesced in an official pattern, practice or custom of WPD officers, including WPD defendant officers, of violating the constitutional rights of the public at large, including T.M., N.S., and the parent Plaintiffs.

91.

Westwego and Chief Munch had been put on notice of the need for policy and training in the use of excessive force and race-based policing due to the numerous past lawsuits and complaints against his department.

26

92.

The actions of the JPSO Deputy Defendants and WPD Officer Defendants as described herein, were unjustified, unreasonable, unconstitutional, excessive and grossly disproportionate to the actions of T.M. and N.S. if any, and constituted an unreasonable search and seizure effectuated through the use of excessive force and a deprivation of Plaintiffs constitutional rights secured to them by the Fourth and Fourteenth Amendments of the United States Constitution.

93.

The actions of the JPSO Deputy Defendants and WPD Officer Defendants described herein were in direct violation of the constitution, law and regulations of the United States and the State of Louisiana.

94.

Sheriff Lopinto, Chief Munch, and Westwego condoned, approved, ratified, facilitated and knowingly acquiesced in the actions of the Defendant Deputies and Officers described herein by failing to properly investigate, discipline and hold accountable the Defendant Deputies and Officers for their actions.

95.

The violations of Plaintiffs' constitutional rights under the Fourth and Fourteenth Amendments to the U.S. Constitution, Plaintiffs' damages, and/or the conduct of the individual Defendants were directly and proximately caused by the actions and/or inactions of Defendants Lopinto and Munch, who have encouraged, tolerated, ratified, and has been deliberately indifferent

27

to the following policies, patterns, practices, and customs, and to the need for more or different training, supervision, investigation, or discipline in the areas of (wherein the terms "officers" and "deputies" may be used interchangeably):

a. Use of force by police officers;

b. Police officers' duties and responsibilities to engage in proper de-escalation techniques;

c. The proper exercise of police powers, including not limited to the making of an arrest and the use of deadly force;

d. Officers' duties not to un-necessarily draw their firearms against citizens;

e. Officers' duties not to un-necessarily use deadly force;

f. Non-race-based policing and use of force;

g. The monitoring of officers whom it knew or should have known were suffering from emotional and/or psychological problems that impaired their ability to function as officers;

h. The failure to identify and take remedial or disciplinary action against officers who were the subject of prior civilian or internal complaints of misconduct;

i. Failing to retrain and/or otherwise control officers who engage in excessive force and/or unjustified shooting against civilians;

j. Failing to follow appropriate policies and procedures to address and correct repeated use of excessive force;

k. The hiring and retention of officers who are unqualified for their employment positions;

l. Failure to require, discipline, and supervise their deputies/officers for not reporting illegal, impermissible, improper, or any other conduct of other deputies/officers that is unbefitting of an officer or violates department policies and protocols;

m. Officers' use of their status as officers to employ the use of force or to achieve ends not reasonably related to their law enforcement duties;

28

n.  The failure of officers to follow established policies, procedures, directive, and instructions regarding arrests, use of force, and institution of criminal charges under such circumstances as presented by this case;

o.  The failure to properly sanction or discipline deputies who are aware of and conceal and/or aid and abet violations of constitutional rights of citizens by other deputies/officers;

p.  As a matter of both policy and practice, Defendants Lopinto and Munch facilitating this type of misconduct by failing to protect civilians from reckless indifference or their departments' agents, servants, and employees.

96.

Sheriff Lopinto and Chief Munch were on actual or constructive notice of the deficiencies with the policies, practices and customs of their departments that make deputy/officer misconduct a foreseeable consequence.

97.

Sheriff Lopinto, Westwego, and Chief Munch knew, must have known, or should have known that the above- referenced policies, practices, and/or customs, would likely lead to serious injury or death to citizens and that such injuries were foreseeable; yet, disregarded that risk.

98.

The aforementioned policies, practices and customs were inadequate in relation to the specific tasks their deputies/officers must routinely perform and with respect to activities where there is an obvious need for proper policies, practices and customs and therefore, illustrated its deliberate indifference and/or reckless disregard to the consequences of officer misconduct.

99.

Sheriff Lopinto, Westwego, and Chief Munch's above referenced policies, practices and/or customs violated the Plaintiffs' constitutional rights; and said policies, practices and/or customs were the moving force behind and proximate cause of said violations.

100.

Sheriff Lopinto, Westwego, and Chief Munch's above referenced policies, practices and/or customs demonstrated a deliberate indifference to the constitutional rights of the public, including the Plaintiffs, and was the proximate cause of the injuries and damages sustained by the Plaintiffs, and evidenced a reckless or callous indifference to the federally protected rights of the Plaintiffs.

101.

By failing to recognize or correct the deficiencies with their policies, practices and customs, Sheriff Lopinto, Westwego, and Chief Munch consciously disregarded the known and foreseeable consequences thereof.

102.

Sheriff Lopinto, Westwego, and Chief Munch's deliberately indifferent policies, practices and customs were the moving force behind Plaintiffs' injuries and the deprivation of their constitutional rights.

103.

There is a direct causal link between the policies, practices and customs and the injuries to and violation of Plaintiffs' constitutional rights.

104.

As a direct and proximate result of the foregoing policies, practices and customs of Sheriff Lopinto, Westwego, and Chief Munch, the violation of the constitutional rights of the public by JPSO deputies and WPD officers was substantially certain to occur.

**Count III**
**State Law Claims**

**Plaintiff v. Defendants Parker, LeBlanc, Smithey, Norton, Nuzzo, Chauvet, Laporte**
**In Their Individual Capacities**

105.

Plaintiffs allege that Defendants Parker, LeBlanc, Smithey, Norton, Nuzzo, Chauvet, and Laporte are responsible and liable for the damages and injuries Plaintiffs have suffered as a result of said Defendants' actions and/or inactions pursuant to Louisiana Code of Civil Procedure Article 2315, which provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it"; Article 2316, which provides that "[e]very person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill"; and Article 2317, which provides that "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody."

31

106.

The actions and/or inactions of Defendants Parker, LeBlanc, Smithey, Norton, Nuzzo, Chauvet, and Laporte under the law of the State of Louisiana, constitute the torts of:

a.  Assault;

b.  Battery;

c.  Aggravated Battery;

d.  Negligent Infliction of Emotional Distress;

e.  Intentional Infliction of Emotional Distress.

**Count IV**
**State Law Claims**

**Plaintiff v. Defendant Westwego**
**Lopinto and Munch In Their Official Capacities**

107.

Plaintiffs allege that Defendants Lopinto, Westwego, and Munch are responsible and liable for the damages and injuries Plaintiffs have suffered as a result of Defendants Parker, LeBlanc, Smithey, Norton, Nuzzo, Chauvet, and Laporte's actions and/or inactions pursuant to Louisiana Code of Civil Procedure Article 2315, which provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it"; Article 2316, which provides that "[e]very person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill"; Article 2317, which provides that "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody";

32

and Article 2320, which provides that "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed…responsibility only attaches, when the masters or employers…might have prevented the act which caused the damage, and have not done it."

108.

The actions and/or inactions of Defendants Lopinto, Westwego, and Munch under the law of the State of Louisiana, constitute the torts of:

a.  Assault;

b.  Battery;

c.  Aggravated Battery;

d.  Intentional Infliction of Emotional Distress;

e.  Negligent Infliction of Emotional Distress;

f.  Negligent Hiring;

g.  Negligent Retention;

h.  Negligent Supervision;

i.  Malfeasance in Office.

**JURY TRIAL DEMAND**

109.

The Plaintiffs request a trial by jury.

**PRAYER FOR RELIEF**

110.

The Plaintiffs respectfully request:

a.  Compensatory damages as to all Defendants;

b.  Special Damages as to all Defendants;

c.  Punitive damages as to all defendants sued in their individual capacity;

d.  Reasonable attorneys' fees and costs as to all Defendants;

e.  Such other and further relief as may appear just and appropriate

WHEREFORE, Tiffany McGee, individually and on behalf of her minor son, T.M., and Nathan O'Quinn and Inez Simmons, individually and on behalf of their minor son, N.S., pray that a copy of the above petition is served upon all of the Defendants named herein, and that after all proceedings a judgment is rendered in favor of Plaintiffs and against Defendants for all relief deemed equitable under the law including attorney's fees and costs.

Respectfully submitted,

*/s/ Christopher J. Murell*
Christopher J. Murell (#32075)
Lewis O. Unglesby (#12498)
Lance C. Unglesby (#29690)
UNGLESBY LAW FIRM
246 Napoleon Street
Baton Rouge, LA 70802
(225) 387-0120
chris@unglesbylaw.com
lisa@unglesbylaw.com
lance@unglesbylaw.com

Ronald S. Haley, Jr. (#30900)
HALEY & ASSOCIATES
ATTORNEYS AT LAW, LLC
8211 Goodwood Blvd Suite E
Baton Rouge, LA 70806
Office: 225-663-8869
Facsimile: 888-900-9771
rhaley@ronaldhaleylawfirm.com

Dedrick A. Moore (#30329)
DEDRICK A. MOORE
ATTORNEYS AT LAW, LLC
4962 Florida Blvd
Baton Rouge, LA 70806
Phone: (225) 412-0412
Fax: (225) 412-0414

*Counsel for the Plaintiffs*